IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 06–cv–00261–EWN

PIPER M. DILLARD,

      Plaintiff,

v.

JOANN BARNHART, Commissioner of
Social Security,

      Defendant.

_____

**ORDER AND MEMORANDUM OF DECISION**
_____

      This is a social security benefits appeal under 42 U.S.C. § 405(g). Plaintiff Piper M.

Dillard challenges the final decision of the Commissioner of Social Security (the

"Commissioner"), denying her application for disability insurance benefits. Jurisdiction is

premised upon 42 U.S.C. § 405(g) (2006).

**FACTS**

*1.*    *Medical Evidence*

      Plaintiff was born on May 2, 1976 and was twenty-six years old at the onset of her alleged

disability. (Admin. R. at 13, 34 [filed May 5, 2006] [hereinafter "Admin. R."].) Plaintiff has a

college education and has worked in the vocationally relevant past as a customer service

representative, human resources director, advertising and marketing director, and a front desk

attendant.  (*Id.* at 44, 49.)  Plaintiff alleges that she became unable to work beginning on March 28, 2003,[1] due to a herniated disc.  (*Id.* at 43.)

On March 1, 2000, Plaintiff was involved in a motor vehicle accident and sought treatment for neck and back soreness at St. Mary's hospital.  (*Id.* at 76–77.)  Plaintiff continued to work full-time until March of 2003.  (*Id.* at 44.)  Diagnostic testing confirmed a herniated disc at the T7–T8 level, with mild effacement of the spinal cord, as well as a remote fracture of the distal sternum.  (*Id.* at 143, 154, 174, 211–12, 225.)  Plaintiff began seeing Richard A. Kingston, D.O. for her injury.  (*Id.* at 86.)  During a March 2000 visit: (1) Plaintiff complained of back spasms; (2) palpation revealed tenderness in the middle and upper back; and (3) Dr. Kingston prescribed Valium three times a day as a muscle relaxant and Tylenol for pain.  (*Id.*)  By May 17, 2000, Plaintiff completed eleven physical therapy appointments with Katie Langelier, P.T., resulting in "minimal improvement."  (*Id.* at 95.)  At her discharge visit, Plaintiff complained that "she could not tolerate [an] upright posture" and that her "back continued to pop and was painful."  (*Id.* at 95.)  Ms. Langelier concluded that Plaintiff had met her "maximum benefit" from physical therapy.  (*Id.* at 96.)  On May 22, 2000, Plaintiff reported to Dr. Kingston that she: (1) had improved pain; (2) experienced pain on less than a daily basis; and (3) had no muscle spasms.  (*Id.* at 81.)  In early June of 2000, Plaintiff stated her pain was intermittent and had not improved

---

[1]In her disability application, Plaintiff gave her onset date as March 1, 2000; however, in a pre-hearing questionnaire, Plaintiff alleged an onset date of March 28, 2003 and does not dispute that later date in her opening brief.  (*See* Admin. R. at 13, 34; Plaintiff's Opening Br. [filed July 7, 2006].)

since her May visit.  (*Id.* at 80.)  On a scale of zero to one-hundred, Plaintiff rated her current

pain at fifty, least pain at ten, and most pain at ninety.  (*Id.* at 184.)

While seen at the Community Hospital in October of 2000, Plaintiff complained of "sharp,

stabbing pain" in her mid-back.  (*Id.* at 143.)  She also reported numbness in her right arm,

tingling in the side muscles of the mid-back, and weakness in the mid-back.  (*Id.*)  Further,

Plaintiff said her pain worsened with walking long distances and sitting, and improved by lying

down and bending.  (*Id.*)

By November 10, 2000, Plaintiff reported her pain level to be 8.5 on a scale of one to ten.

(*Id.* at 88.)  Further, Plaintiff's physical therapist noted Plaintiff was: (1) compliant with all home

program assignments; (2) had begun a training program at a gym; and (3) had given away her dog

because she could not walk it.  (*Id.*)

In November of 2000 and January and April of 2001, Plaintiff saw David Mayer, M.D., an

orthopedic surgeon.  (*Id.* at 199–204.)  In November of 2000, Dr. Mayer noted that Plaintiff had

marked tenderness in her back and hyperextension, which caused a significant amount of radiant

pain in her left and right legs.  (*Id.* at 204.)  He limited her to lifting no more than fifteen pounds.

(*Id.* at 202.)  Examination revealed no numbness and marked tenderness of the back.  (*Id.* at 204.)

In January of 2001, Dr. Mayer stated that although Plaintiff was still symptomatic, she was

"getting along fairly well."  (*Id.* at 201.)  In April of 2001, he found she was "much less

symptomatic," though she still had pain in her spine at least once a day for a few minutes.  (*Id.*)

Dr. Mayer found Plaintiff was not a good surgical candidate and should be treated conservatively.

(*Id.* at 201, 204.)  Further, on July 24, 2001, Dr. Mayer noted that he "would suspect that this will be a permanent injury as a result of the auto accident with the abnormal disc."  (*Id.* at 199.)

Plaintiff began seeing Ellen Price, D.O. for her neck and back pain in June of 2000.  (*Id.* at 186.)  Dr. Price referred Plaintiff to a massage therapist, Leslie Hughes, for biofeedback[2] and by November 10, 2000, Plaintiff had completed six sessions.  (*Id.* at 88, 109–117.)  On a July 25, 2000 visit, Plaintiff complained of "constant moderate to severe stabbing pain in her mid back," as well as soreness to the touch.  (*Id.* at 115.)  Ms. Hughes noted Plaintiff was stiff in trunk flexion, could not bend backwards, was hypersensitive all around the mid back area, and had to change positions every few minutes to be comfortable.  (*Id.*)  Ms. Hughes made similar observations during later visits, noting Plaintiff's hypersensitivity on her back and minimal relief from treatment.  (*Id.* at 110–14.)  Ms. Hughes reported that she was unable to use any pressure on Plaintiff's back and that Plaintiff felt no relief from the first two sessions.  (*Id.* at 114–5.)  By September, Plaintiff experienced less hypersensitivity, less tension and soreness in her upper body, and needed to change positions less frequently.  (*Id.* at 109–10.)  On October 12, 2000, the date of her final treatment, Plaintiff reported extreme pain and stiffness in her midback and was hypersensitive to touch.  (*Id.* at 108.)  Hughes opined that muscular therapy had not had a "long-term benefit" for Plaintiff.  (*Id.*)

---

[2]Biofeedback is "[t]he process of making involuntary and unconscious bodily functions (as the heartbeat) perceptible to the senses (of vision or hearing) in order to control them by conscious mental effort."  1–B Attorneys' Dictionary of Medicine 3340 (Matthew Bender & Co. 2005).

In September 2000, Dr. Price noted that Plaintiff's biofeedback therapist believed that psycho-social issues as well as Plaintiff's obesity were contributing to her pain. (*Id.* at 176.) Dr. Price thought it would be appropriate to send Plaintiff to a psycho-social screen to address whether any such issues were inhibiting her recovery. (*Id.*) Further, Dr. Price declined to administer an epidural injection because: (1) it was too aggressive of a procedure for Plaintiff's injury; and (2) there was no evidence of inflammation, which is generally a prerequisite for the procedure. (*Id.*) Finally, Dr. Price noted that Plaintiff had been working about forty hours a week and had reported "it [was] going okay." (*Id.* at 175.)

On December 12, 2000, on Plaintiff's final appointment with Dr. Price, the doctor opined that a ten pound lifting restriction on Plaintiff was too restrictive. (*Id.* at 171.) Dr. Price "would place [Plaintiff] more at the light to medium work category. She [was] working full time and doing fairly well at that." (*Id.*) Dr. Price concluded that unless Plaintiff wished to receive acupuncture, "she is probably at maximum therapeutic benefit." (*Id.*)

Medical records show Plaintiff saw Ronald O. Royce, D.O. from October 2001 to September 2002. (*Id.* at 206–14.) On October 24, 2001, Plaintiff complained of pain localized between the shoulder blades and rated its severity at six out of ten. (*Id.* at 209.) Dr. Royce recommended anti-inflammatories as well as an exercise routine. (*Id.*) He read a December 26, 2001 magnetic resonance imaging ("MRI") as showing a "small-to-moderate . . . disc herniation effacing the ventral subarachnoid space," no acute fracture, soft tissue swelling, or evidence of disc bulge. (*Id.* at 211–14.) In January 2002, Plaintiff "continue[d] to have pain which [was] constant with sometimes shooting pain." (*Id.* at 208.) She reported doing her home exercise

program and using her medications.  (*Id.*)  Dr. Royce prescribed physical therapy and a gym

membership for long-term reconditioning.  (*Id.* at 208.)  On September 13, 2002, Plaintiff stated

she "continue[d] to have episodes of [back pain] that have caused her to miss work."  (*Id.* at 206.)

She was to return to the clinic in a week to have "paperwork filled out to support her occasional

need for missing [work]."  (*Id.*)

 By March of 2002, Plaintiff had completed another round of twelve physical therapy visits.

(*Id.* at 210.)  Her physical therapist reported that Plaintiff had full active range of motion of the

thoracic spine "with hesitation and complaint of pain upon thoracic extension."  (*Id.*)  Further,

Plaintiff had some decreased back mobility and ability to extend.  (*Id.*)  At discharge, Plaintiff had

"no significant change in complaint of pain or muscle extensibility."  (*Id.*)

 In a letter dated April 16, 2002, Wayne M. Johnson, M.D. reviewed the history and

prognosis of Plaintiff's injury based on an evaluation one month prior.  (*Id.* at 194–97.)  Plaintiff

reported to Dr. Royce that: (1) none of the various treatments she had undergone during the

previous two years had resolved her pain; (2) "without being guaranteed [one hundred percent]

success rate with operative intervention . . . she preferred to live with her symptoms;" and (3)

"she [was] able to work her job as a customer service rep[resentative], but occasionally ha[d] to

bend over to compensate for this dull, achy pain that occur[red] at times."  (*Id.* at 195–96.)

Clinical examination revealed a normal gait, full range of motion in lumbar and thoracic spine,

normal posture, no gross deformities, tenderness upon palpation, and no spasm.  (*Id.*)  Dr.

Johnson opined that, considering Plaintiff's rejection of surgical intervention, she had reached

"maximum therapeutic benefit," though she should continue to have two or three visits yearly for

medication prescriptions as needed "to allow [Plaintiff] to continue to work with her chronic

thoracic pain." (*Id.* at 196–97.)

In December 2002, Plaintiff began seeing Patricia Rand, M.D., because Plaintiff wanted to

establish a relationship with a doctor who would provide a note for those days when Plaintiff's

pain prevented her from working. (*Id.* at 218.) Plaintiff complained of "worsening of her back

pain with more frequent episodes over the last six months or so." (*Id.*) A December 2002 MRI

revealed no change since the December 2001 MRI. (*Id.* at 225.) On January 20, 2002, Dr. Rand

noted that although Dr. Royce indicated that Plaintiff should be expected to miss one to three

days of work each month due to back pain, Dr. Rand did not feel "it was necessary to have

[Plaintiff] take time off every month," because her job duties primarily involve phone work and

involve no lifting whatsoever. (*Id.* at 217.) Plaintiff was "suprisingly in agreement with [Dr.

Rand] but did state that she would like to have multiple breaks during the day away from the

phone." (*Id.*) Dr. Rand and Plaintiff agreed that "up to five [ten]-minute breaks a day would

assist with her symptoms." (*Id.*) In a February 14, 2003 clinical note, Dr. Rand wrote that

Plaintiff had called seeking a note to take four days off from work during the previous week. (*Id.*

at 216.) Dr. Rand explained that "[she] would not be able to excuse [Plaintiff] any more from

work . . . based on the details of her job responsibility as well as her medical diagnosis." (*Id.*)

"[I]f this was unacceptable," Dr. Rand suggested that "[Plaintiff should] seek assistance from a

new physician." (*Id.*)

On March 26, 2002, Plaintiff began seeing Timothy Hall, M.D. for her neck and back pain. (*Id.* at 274–75.) Plaintiff described her pain as "an aching tight sensation which usually worsen[ed] with fixed positions," and stated she experienced "a lot of local spasm." (*Id.* at 273–74.) Further, Dr. Hall wrote that trigger point work and a thoracic epidural did not help Plaintiff's pain. (*Id.*) Under a section entitled "Impressions," Dr. Hall opined that Plaintiff had myofascial[3] dysfunction and pain. (*Id.* at 275.) In April 2002, Dr. Hall noted his disagreement with Dr. Johnson's determination that Plaintiff was at maximum therapeutic benefit, opining that Plaintiff may benefit from acupuncture or Botox injection. (*Id.* at 273.) In February of 2003, Dr. Hall noted that Plaintiff was taking Flexeril, a muscle relaxant, with "fair result." (*Id.* at 271.) On March 21, 2003, Dr. Hall wrote, "[Plaintiff] still has spasm and pain between her shoulder blades that brings her to tears. It has been difficult for her to function." (*Id.* at 268.) He decided to administer Botox injections, stating, "We need to do something to try to get a change in this situation. She is getting more and more dysfunctional and having difficulty dealing with these pain symptoms." (*Id.* at 268.) Dr. Hall also referred Plaintiff to an acupuncturist "to try to control [her] worsening symptoms." (*Id.*) In April of 2003, Plaintiff stated that the Botox injections did not change her "overall pain situation." (*Id.* at 269.) In April and May of 2003, Dr. Hall wrote the following:

> We had a fairly lengthy discussion about her overall situation today. She became quite emotional which is understandable. She has had to leave her job. She simply

---

[3]Myofacial is "[p]ertaining to, or involving . . . the thin but tough membrane which surrounds the body under the skin [and] surrounds individual muscles." 4–M ATTORNEYS' DICTIONARY OF MEDICINE 3340 (Matthew Bender & Co. 2005).

> could not tolerate the prolonged sitting. . . .  I wish there were more I could do.  I have her involved in all I can think of.

(*Id.* at 269.)

> This is a woman I have been working with who has ongoing consistent pain through the thoracic area due to local disc disease.  She is not a candidate for surgery and she has to deal with this pain which is fairly significant.  It interrupts pretty much everything she does during the day and is making sleep difficult.

(*Id.* at 267.)  Although Dr. Hall believed the Botox had "helped with some of the muscle spasm which often complicate[d Plaintiff's] pain," he stated, "[it] has not helped as much as we had hoped.  She is able to do more before spasm complicates the situation and it has led to some increase in her standing and sitting tolerances."  (*Id.*)  Dr. Hall prescribed Lidoderm patches, which cause a feeling of numbness.  (*Id.*)  In June 2003, Dr. Hall filled out a functional capacity evaluation, concluding that Plaintiff could: (1) sit and walk intermittently for two hours a day; and (2) lift and stand intermittently for one hour a day.  (*Id.* at 277.)  He opined that Plaintiff could work zero hours a day and had not reached maximum improvement.  (*Id.*)

In May of 2003, a state medical examiner evaluated Plaintiff and determined she could: (1) occasionally lift and carry twenty pounds; (2) frequently lift and carry ten pounds; (3) stand and/or walk about six hours in an eight-hour work day; (4) sit about six hours in an eight-hour work day; and (5) push and pull in an unlimited manner.  (*Id.* at 235–42.)  Further, Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations.  (*Id.*)  The medical examiner concluded that Plaintiff's complaints of pain and limitations were not fully credible or consistent with the medical findings.  (*Id.* at 240.)

Clinical notes by Russell A. Parker, D.O., in April and May of 2003 show Plaintiff complained of "major upper back pain" between her shoulder blades.  (*Id.* at 244–47.)  Physical exam revealed "exquisite tenderness to light touch" on parts of Plaintiff's back.  (*Id.*)  Plaintiff complained of regular pain flare-ups and stated that driving exacerbated her pain.  (*Id.*)  Dr. Parker treated Plaintiff with acupuncture and cupping, which provided temporary relief.  (*Id.*)  Plaintiff also sought medication for her pain.  (*Id.*)  On June 2, 2003, Plaintiff stated she had a pain level of six out of ten and was "quite miserable over the weekend."  (*Id.* at 243.)  She exhibited some pain behaviors, and physical exam showed "dramatic tenderness to light" touch in the area of her thoracic pain.  (*Id.*)

In May of 2003, Dr. Hall referred Plaintiff to Dr. Robert Tinker, Ph.D., a clinical psychologist, for evaluation for post-traumatic stress disorder ["PTSD"] arising out of her previous automobile accident.  (*Id.* at 252.)  Dr. Tinker concluded "[Plaintiff had] the full range of PTSD symptoms, including [i[ntrusive, [a]voidant, and [h]yperaroused symptoms."  (*Id.* at 252.)  Further, her symptoms included fears of being in a vehicle and driving.  (*Id.* at 250.)  Finally, Dr. Tinker concluded that Plaintiff would have a moderate limitation in her ability to maintain attention and concentration for extended periods.  (*Id.*)  By June 18, 2003, Dr. Tinker found that Plaintiff's symptoms of PTSD had greatly improved and had reached a sub-clinical level.  (*Id.* at 251.)  On June 17, 2003, Dr. Tinker noted in a letter to Plaintiff's insurer that "[t]he fact that no diagnosis [of PTSD] was made for three years [after the accident], does not meant that the condition did not exist for three years, but rather, that no medical practitioner understood the

significance of her intrusive, avoidant, and hyperaroused symptoms until she was evaluated by Dr. Hall." (*Id.* at 250.)

On July 16, 2003, Dr. Hall noted "[Plaintiff] continues to have considerable pain in her thoracic and upper lumbar areas . . . that has not responded to our interventions." (*Id.* at 266.) Further:

> [Plaintiff] asked if there was anything else to do.  We decided to try a TENS unit, [which sends electrical signals to certain parts of the body to block pain signals], and she was referred.  I have also started her on Ultracet to see if this might work without the side effects of opiates.  She usually gets gastrointestinal upset with opiates.  We have tried a number of different muscle relaxers with only minimal improvement.

(*Id.*)  In December 2003, Dr. Hall reported that Plaintiff could not place the TENS unit pads in the area where it actually hurt, because she could not handle the sensation.  (*Id.* at 265.)  He noted that her pain continued and she had experienced recent major flare-ups resulting in emergency room visits.  (*Id.*)  In February of 2004, Dr. Hall wrote that Plaintiff's pain was persistent and that Botox injections were the only helpful treatment.  (*Id.* at 264.)  Although the Botox could not treat the underlying disc pain, it did help muscle spasms, which Dr. Hall opined were sending Plaintiff to the emergency room.  (*Id.*)  He stated, "Even though the injections are very difficult for her, she asked about repeating them and I think it is certainly a reasonable thing to do." (*Id.*)  On exam, Dr. Hall found "obvious spasm" in Plaintiff back, as well as exquisite tenderness.  (*Id.*)  On March 24, 2004, Dr. Hall noted "[Plaintiff] continues to struggle with mid thoracic disc pathology and severe local pain which we have not been able to control with conservative interventions . . . ." (*Id.* at 263.)  Further, he found "[s]he is becoming less and less

functional and having more difficulty coping with pain over time. . . .  I decided to start her on

chronic opiates in hope of controlling her symptoms and improving her quality of life."  (*Id.*)  Dr.

Hall completed a functional capacity evaluation for Plaintiff on April 21, 2004, concluding that

Plaintiff could: (1) sit, walk, and stand up to one hour each day; and (2) lift no more than ten

pounds.  (*Id.* at 276.)  Further, he concluded Plaintiff could work zero hours a day and had

reached maximum improvement.  (*Id*)

      Plaintiff was seen at the emergency room for her back pain in December 2003, February

2004, and May 2004.  In December 2003, Plaintiff went after "wrestling around" with a friend.

(*Id.* at 288.)  Plaintiff rated the severity of her pain at ten out of ten and stated that her pain flared

up like this about twice each month.  (*Id.* at 288, 293.)  Physical exam showed Plaintiff was "very

rigid . . . and appear[ed] to have a clear muscle spasm.  She [could] not even lean forward to

allow examination of her back."  (*Id.* at 288.)  Plaintiff was diagnosed with "[a]cute exacerbation

of back pain."  (*Id* at 289.)  She was prescribed Vicodin for pain and a work note "if needed."

(*Id.* at 289.)  In February 2004, Plaintiff was seen because "[s]he started getting a little back pain

in her back in the last couple of days."  (*Id.* at 281.)  Physical exam showed Plaintiff was

hyperventilating due to pain in her back.  (*Id.*)  The emergency room doctor prescribed

medication to ease her immediate pain and a narcotic for future pain control.  (*Id.* at 282.)  In

May of 2004, Plaintiff presented with "intermittent" pain over the last few days.  (*Id.* at 278.)

Upon exam, Plaintiff described "a little bit" of thoracic pain but had no problem with reflexes.

(*Id.* at 279.)  The emergency room doctor prescribed a narcotic and muscle relaxant for Plaintiff's

pain.  (*Id.* at 279.)

On May 24, 2004, Eric O. Ridings, M.D. was hired by Plaintiff's insurer to evaluate her. (*Id.* at 297–303.) Dr. Ridings reported that Plaintiff did not feel she had improved since the onset of her back pain, which varied on a scale of one to ten from four to ten in severity, with an average of seven out of ten. (*Id.* at 298.) He wrote:

> She believes that she can sit, walk, or drive for about half an hour, or stand for about an hour, and lift [up to ten] pounds. She notes that her pains are not constant and that there are, upon reflection, about maybe two hours out of a day when she is not in pain. When she has increased discomfort, she will lie down or sit down. This happens about every [fifteen] minutes. . . . Her activity level depends on the severity of her symptoms on that day. She notes that on some days she is able to do laundry, cook, or vacuum, but not on other days.

(*Id.*) "She noted that her pain complaints have been gradually getting worse over time." (*Id.*) Regarding her pain medication, Plaintiff reported that her chronic opiates caused her to be "'very nauseous; and 'extremely dizzy' [when she walked], so she pretty much remain[ed] lying down through the half day that this medication [was] effective." (*Id.* at 301.) Dr. Ridings also noted that Plaintiff was taking a "very high dose" of muscle relaxants that caused "some sedation." (*Id.*)

Physical examination showed Plaintiff had "multiple severe pain behaviors" as well as "complaints of severe tenderness with light palpation" in some regions of her back. (*Id.* at 301.) She showed a decreased range of motion and "became tearful with forward flexion of the shoulders." (*Id.* at 301.) "When asked to move from a seated position into a prone position on the examination table, she began to cry while apparently attempting this movement . . . . The patient was timed to take a full two minutes in moving from seated to supine." (*Id.* at 302.) Dr. Ridings observed that Plaintiff walked slowly with her back flexed forward twenty-five degrees at

the waist. (*Id.*) He stated, "[i]t is entirely unclear to me what this difficulty with ambulation has

to do with upper back pain, and, indeed, forward flexion would be expected to increase thoracic

pain rather than decrease it." (*Id.* at 302.) Ultimately, Dr. Ridings concluded that Plaintiff's disc

protrusion likely existed prior to the accident, and that her pain symptoms "[could] in no way be

related to the original motor vehicle accident, but rather are psychologically based or factitious."

(*Id.*) Accordingly, he determined that Plaintiff should be tapered off her pain opiates. (*Id.*)

In March of 2005, upon referral by Dr. Hall, William Lippert, M.D. gave Plaintiff a steroid

injection to treat her back pain.[4] (*Id.* at 315–21.) Plaintiff rated her pain at four out of ten and

said her chief complaint was muscle spasms that were often unpredictable, but could be brought

on by "lifting maneuvers, prolonged standing or stress." (*Id.* at 315.) Further, "medications and

changing positions or lying down usually decrease[d] discomfort." (*Id.*) Dr. Lippert noted that

Plaintiff was constipated and nauseous secondary to her medication. (*Id.* at 315–16.) In May of

2005, Plaintiff reported no improvement in her pain from the injection. (*Id.* at 318.) Dr. Lippert

gave Plaintiff another injection but explained that if this second injection was "ineffective, further

injections would also be ineffective." (*Id.* at 318.) By July of 2005, Plaintiff reported no

---

[4]The evidence from Dr. Lippert was not before the ALJ, but was submitted as additional evidence to the Appeals Council. (*Id.* at 305–21.) "The Appeals Council must 'consider evidence submitted with request for review if the additional evidence is (a) new, (b) material, and (c) related to the period on or before the date of the ALJ's decision.'" *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004) (quoting *Box v. Shalala*, 52 F.3d 168, 171 [9th Cir. 1996] [further internal quotations omitted]). In the instant case, the Commissioner does not deny that the evidence from Dr. Lippert meets these qualifications. (*See* Def.'s Resp. at 12–13.) Thus, this evidence is "part of the record [this court] assess[es] in evaluating the Commissioner's denial of benefits." *Chambers*, 389 F.3d at 1142.

improvement in her pain, and Dr. Lippert performed a thoracic diskography[5] to "verify or deny a

diskogenic syndrome." (*Id.* at 320.) Dr. Lippert's assessment was as follows:

> This is a positive diskography revealing partial concordant midback pain . . . . I
> think one of the most significant elements we have learned today is that the patient,
> unfortunately, has a very low pain threshold, and I think this will frustrate
> treatment of this pain problem, medical or interventional.  From our findings . . . .
> [w]e have confirmed significant pain coming from [her] disc . . .  I think given her
> lack of response to central steroid, unless surgical intervention is entertained,
> which would obviously include very significant risk to the patient, she likely should
> be managed medically from this point forward; and I think, as mentioned above,
> she will be a very difficult patient to manage in this way given the pain threshold.

(*Id.* at 321.)

## 2.    *Procedural History*

On April 3, 2003 Plaintiff filed an application for disability insurance benefits.  (*Id.* at

34–36.)  On May 19, 2003, the Social Security Administration denied Plaintiff's application.  (*Id.*

at 32.)  On May 29, 2003, Plaintiff requested a hearing before an administrative law judge

("ALJ").  (*Id.* at 33.)  On September 8, 2004, the ALJ held a hearing, at which Plaintiff and a

vocational expert ("VE"), Nora Dunne, testified.  (*Id.* at 12–19.)

Plaintiff testified as follows.  Her greatest obstacle to work was her "[in]ability to

concentrate" when her back was in spasm.  (*Id.* at 333.)  She had spasms lasting several hours

every day and severe spasms one to two times per week, necessitating that she lie down two to

three times a day for forty-five minutes to an hour.  (*Id.* at 333, 337.)  She treated her spasms

---

[5]A diskography is "[a] diagnostic procedure used to detect and localize injured or
pathological intervertebral disks."  2–D ATTORNEYS' DICTIONARY OF MEDICINE 3340 (Matthew
Bender & Co. 2005).

either with medication, body position adjustment, or breathing methods.  (*Id.* at 334–35.)  She experienced roughly an equal number of good and bad days.  (*Id.* at 338.)  She used a cane once or twice a month when her pain was severe.  (*Id.* at 335.)  Plaintiff's medications made her drowsy.  (*Id.* at 337.)  She estimated she could walk for "about [fifteen] minutes to a half an hour," and sit for "half an hour to [forty-five] minutes."  (*Id.* at 334–35.)  Plaintiff testified that her daily activities included little more than a few household chores.  (*Id.* at 333, 336.)  Further, Plaintiff testified that she stopped seeing Dr. Tinker because her injury "wasn't a whole lot psychological."  (*Id.* at 340.)

The VE testified at the hearing regarding her review of the vocational exhibits in Plaintiff's file.  (*Id.* at 341–44.)  The VE testified that Plaintiff's past work as: (1) a long-distance operator was light with a specific vocational preparation ("SVP")[6] of three; (2) recruiter was sedentary with an SVP of six; (3) human resources director was sedentary with an SVP of eight; (4) marketing director was sedentary with an SVP of eight; and (5) front desk receptionist was sedentary with an unstated SVP.  (*Id.* at 341.)  Additionally, the VE opined on hypothetical questions posed by the ALJ.  (*Id.* at 341–43.)  First, the VE was to assume an individual of Plaintiff's age, education, and skill level, who: (1) could perform work at a light exertional level; and (2) could not stand or walk for more than a total of two hours in an eight-hour day.  (*Id.* at 341.)  The VE opined that such an individual would be capable of performing Plaintiff's past

---

[6]SVP is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *Dikeman v. Halter*, 245 F.3d 1182, 1186 n.2 (10th Cir. 2001) (citation and internal quotation marks omitted).

sedentary work and most likely the light work as an operator.  (*Id.* at 342.)  Second, the ALJ

asked the VE to assume the same individual, but with the ability to perform only sedentary work.

(*Id.* at 342.)  The VE opined such a person would be capable of performing all of Plaintiff's past

sedentary jobs.  (*Id.*)  Further the VE opined that an individual with any of the of following needs

could not engage in substantial gainful activity: (1) lying down two to three times a day for forty-

five minutes to an hour; (2) taking more than five ten-minute breaks unpredictably throughout the

day; (3) being able to sit, walk, and stand no more than one hour in an eight-hour day; and (4)

being able to sit and walk no more than two hours and stand no more than one hour in an eight-

hour day.  (*Id.* at 342–43.)

On October 24, 2004, the ALJ issued a decision reflecting her finding that Plaintiff was

not disabled within the meaning of the Social Security Act, because Plaintiff retains the residual

functional capacity ("RFC") to perform her past relevant work as a recruiter.  (*Id.* at 18.)  In

reaching her conclusion, the ALJ first found that Plaintiff had not engaged in substantial gainful

activity since March 28, 2003.  (*Id.* at 13.)  The ALJ next determined that Plaintiff's herniated

disc and myofascial pain syndrome were medically determinable, severe impairments.  (*Id.* at 14.)

Despite their severity, the ALJ determined that these impairments were not sufficiently severe to

meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations

Number 4.  (*Id.*)  Additionally, the ALJ found that although Plaintiff's testimony was "forthright

and sincere," "her complaints are not found to be fully persuasive and have been given little

weight."  (*Id.* at 16.)

Based on the evidence presented, the ALJ concluded that Plaintiff had the RFC to:

> perform the full range of sedentary work as well as work consisting of light exertional limits with no more than two hours of standing/walking in an eight-hour day and the ability to alternate between sitting and standing at will.  Sedentary work involves lifting no more than [ten] pounds at a time, standing and walking occasionally, and sitting the remainder of the time.   Light work involves lifting of no more than [twenty] pounds at a time, frequently lifting and carrying objects weighing up to [ten] pounds, and may involve a good deal of standing and walking.

(*Id.* at 17.)  In accord with this RFC, the ALJ determined that Plaintiff could perform her past relevant work as a recruiter and, therefore, was not disabled.  (*Id.* at 18.)

On January 30, 2006, the Appeals Council affirmed the ALJ's decision, making it the final administrative decision for the purposes of judicial review.  (*Id.* at 5–7.)  On February 16, 2006, Plaintiff filed a complaint in this court challenging the Commissioner's denial of disability benefits. (Compl. [filed Feb. 16, 2006].)  On July 17, 2006, Plaintiff filed her opening brief.  (Pl.'s Opening Br. [filed July 17, 2006] [hereinafter "Pl.'s Br."].)  On August 21, 2006, the Commissioner filed a response.  (Def.'s Resp. Br. [filed Aug. 21, 2004] [hereinafter "Def.'s Resp."].)  On September 6, 2006, Plaintiff replied in support of her brief.  (Pl.'s Reply to Def.'s Resp. [filed Sept. 6, 2006] [hereinafter "Pl.'s Reply"].)

# ANALYSIS

## 1.    *Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C. § 1383(c)(3) (2006) (incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact,
> if supported by substantial evidence, shall be conclusive, and where
> a claim has been denied by the Commissioner of Social Security or
> a decision is rendered under subsection (b) of this section which is
> adverse to an individual who was a party to the hearing before the
> Commissioner of Social Security, because of failure of the claimant
> or such individual to submit proof in conformity with any regulation
> prescribed under subsection (a) of this section, the court shall
> review only the question of conformity with such regulations and
> the validity of such regulations.

42 U.S.C. § 405(g) (2006). Thus, this court's review is limited to determining whether the record

as a whole contains substantial evidence supporting the Commissioner's decision. *See id.*;

*Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992). The

court must uphold the Commissioner's decision if it is supported by substantial evidence. *See*

*Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987). This court cannot reweigh the evidence

nor substitute its judgment for that of the ALJ. *Jordan v. Heckler*, 835 F.2d 1314, 1316

(10th Cir. 1987). That does not mean, however, that my review is merely cursory. To find that

the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant

evidence that a reasonable person might deem adequate to support the ultimate conclusion. *Frey*

*v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). A decision is not based on substantial evidence if

it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence

supporting it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The ALJ's decision is also

subject to reversal for application of the wrong legal standard. *Bernal v. Bowen*, 851 F.2d 297,

299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

**2.      *Evaluation of Disability***

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than sixty-five years of age, and is under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The Social Security Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2006). In proving disability, a claimant must make a *prima facie* showing that she is unable to return to the prior work she has performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability-insurance benefits. *See* 20 C.F.R. § 404.1520 (2006); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis). A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded. *See* 20 C.F.R. § 404.1520(a) (2006); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). First, the claimant must demonstrate that she is not currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(b) (2006). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits her physical or mental ability to do basic work activities. *Id.* § 404.1520(c). At the third step, if the impairment matches

or is equivalent to established listings, then the claimant is judged conclusively disabled.  *Id.* § 404.1520(d) (2006).  If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step.  At this stage, the claimant must show that the impairment prevents her from performing work she has performed in the past.  *See Williams*, 844 F.2d at 751 (citations omitted).  If the claimant is able to perform his previous work, she is not disabled.  20 C.F.R. § 404.1520(e) (2006); *Williams*, 844 F.2d at 751.  The fifth step requires the Commissioner to demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience; and (2) there is availability of that type of work in the national economy.  *See*  20 C.F.R. § 404.1520(f) (2006); *Williams*, 844 F.2d at 751.

### 3.        *Disability Determination*

Plaintiff sets forth three arguments in support of her contention that the ALJ's decision is erroneous.  Plaintiff argues the ALJ erred in: (1) assessing Plaintiff's credibility; (2) rejecting the opinion of Plaintiff's treating physician; and (3) basing her RFC on a non-medical opinion.  (Pl.'s Br. at 2–17.)  I address each argument below.[7]

---

[7]In the interest of clarity, I analyze Plaintiff's arguments out of the sequential order in which they appear in her brief.

### a.      *Credibility Assessment*

The ALJ found Plaintiff less than fully credible, because: (1) Plaintiff received some treatments that were not supported by the medical findings; (2) there are no clinical findings supporting Plaintiff's stated need to lie down for up to three hours a day, four days a week; (3) Plaintiff's testimony regarding the severity and frequency of her pain was inconsistent; (4) Plaintiff's emergency room visits described only a limited degree of pain; (5) Plaintiff may have stopped work due to the potential secondary gain from a financial settlement; and (6) Plaintiff stopped working over three years after the precipitating car accident, but the medical findings do not support a worsening of her back condition at that time.  (Admin. R. at 16.)

"'Credibility determinations are peculiarly the province of the [ALJ].'"  *McGoffin v. Barnhart*, 288 F.3d 1248, 1254 (10th Cir. 2002) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 [10th Cir. 1995]).  Indeed, credibility determinations made by an ALJ are generally considered binding upon review.  *Gossett v. Bowen*, 962 F.2d 802, 807 (10th Cir. 1988).  Such determinations "should not be upset if supported by substantial evidence."  *White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2001).  In assessing credibility, the ALJ may consider several factors, including subjective measures of credibility, as well as the consistency of the nonmedical evidence with the medical record.  *See Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir. 1988).

Plaintiff argues the ALJ's credibility determination was not supported by substantial evidence, because: (1) multiple physicians have documented findings consistent with chronic pain; (2) Plaintiff sought extensive medical treatment to control her pain; (3) Dr. Ridings' bias makes

his assessment of little value; (4) Plaintiff's settlement was smaller than her potential work

earnings; and (5) Plaintiff's testimony regarding the frequency and severity of her pain was

consistent.[8]  (Pl.'s Br. at 9–15.)

Regarding Plaintiff's first point, she cannot prove error by showing there are medical

findings consistent with her complaints of chronic pain; instead, Plaintiff must show that the ALJ's

determination regarding Plaintiff's pain is not supported by substantial evidence.  *Ellison v.

Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990).  Thus, where evidence as a whole can support

either the agency's decision or an award of benefits, the agency's decision must be affirmed.  *See

Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).  Here, there is

substantial evidence supporting the ALJ's conclusion that the medical findings did not support the

full extent of Plaintiff's pain complaints.  (Admin. R. at 16.)  In January 2002, Dr. Rand stated

that in spite of Plaintiff's repeated requests for a note to miss work, the doctor did not feel it was

necessary for Plaintiff to have to take time off every month.  (*Id.* at 217.)  Further, in February of

2003, one month before Plaintiff alleges she became disabled, Dr. Rand stated that "[she] would

not be able to excuse [Plaintiff] any more from work . . . based on the details of her job

responsibility as well as her medical diagnosis." (*Id.* at 216.)  Similarly, Dr. Ridings concluded

that Plaintiff's pain was psychological or fictitious in nature and that she should be tapered off her

pain medication.  (*Id.* at 302.)  Finally, although Dr. Lippert confirmed that Plaintiff was in fact

---

[8]In this order, I rarely refer to counter-arguments in the Commissioner's response brief, because she failed to directly address the vast majority of Plaintiff's arguments.  (*See* Def.'s Resp.)

experiencing pain from her herniated disc, he found that Plaintiff had a "very low pain threshold," suggesting Plaintiff's pain complaints were more severe than would be expected from her diagnosis. (*Id.* at 321.) Thus, I find the ALJ's conclusion that the medical findings were incongruous with Plaintiff's complaints of pain was supported by substantial evidence.

Second, Plaintiff argues that the ALJ did not properly consider Plaintiff's extensive pursuit of medical treatments. (Pl.'s Br. at 12–13.) Yet, the ALJ specifically noted Plaintiff's pursuit of such treatments, while also concluding that record evidence shows these treatments were sometimes performed without supporting medical findings. (Admin. R. at 16.) Plaintiff argues the only medical source suggesting that some treatments were unnecessary was Dr. Ridings, who was hired by Plaintiff's insurance company to contest payment of her medical expenses, and whose opinion should be discounted because of bias. (Pl.'s Br. at 12–13.)
Plaintiff concerns of bias are not without basis, as Dr. Ridings' employer may arguably have an influence over the outcome of Plaintiff's evaluation. Nonetheless, the fact that Dr. Ridings was employed by an interested party does not serve to wholly invalidate his medical opinion, particularly considering that much of Dr. Ridings' evaluation is supported by the views of other presumably unbiased medical sources. *Cf.* Social Security Ruling ("SSR") No. 96–6p, at *1–2, 1996 SSR LEXIS 3 (July 2, 1996) (mandating that an ALJ may not ignore and must explain the weight given to opinions of state agency medical sources). In December of 2000, Dr. Price concluded that Plaintiff had reached maximum therapeutic benefit. (Admin. R. at 171.) Arguably,

any treatment after this date was not medically necessary or even beneficial.[9]  Similarly in April of

2004, even Dr. Hall concluded that Plaintiff had reached her maximum level of improvement.  (*Id.*

at 276.)  Yet, almost a year later, Dr. Lippert administered two epidural steroid injections to

Plaintiff, both of which were ineffective in treating Plaintiff's pain.  (*Id.* at 318–21.)  Moreover,

these epidurals were performed despite a total lack of evidence of inflammation, which Dr. Price

explained was essentially a prerequisite for the performance of such a procedure.  (*Id.* at 176.)

Thus, the ALJ's conclusion that Plaintiff received some treatments that were not medically

necessary is supported by substantial evidence.

Third, Plaintiff argues her settlement money could not have been an incentive to quit

work, because the settlement was smaller than her potential earnings.  (Pl.'s Br. at 13–14.)  Even

assuming Plaintiff is correct, she may have preferred this lesser sum to the prospect of full-time

work.  Still, the ALJ points to no evidence besides the fact of the settlement to support her

presumption regarding Plaintiff's incentive to avoid work.  (*See* Admin. R. at 16.)  Thus, I find

the ALJ's conclusion is merely speculative and unsupported by substantial evidence.  *See Winfrey*

*v. Chater*, 92 F.3d 1017, 1020–21 (10th Cir. 1996) (rejecting as speculative ALJ's conclusion that

the terms of plaintiff's pension provided an incentive not to work).

The ALJ also found Plaintiff's testimony regarding the frequency of her significant pain

inconsistent, because while Plaintiff claimed to have severe pain one or two times each week for

---

[9]Dr. Hall disagreed with Dr. Price's assessment and continued to administer treatments.
(Admin. R. at 273.)  Notably, Plaintiff reported minimal to no improvement of her pain as a result
of these treatments.  (*See id.* at 267, 269.)

several hours, she also stated that she used her cane when the pain was "really severe," which was only once or twice each month. (*Id.* at 16, 333–36.) Plaintiff argues there is no inconsistency, because she never testified she used the cane *every time* her back pain was severe. (Pl.'s Br. at 14.) I agree with Plaintiff and find the ALJ's conclusion lacks substantial evidentiary support.

Although Plaintiff has identified certain infirmities in the ALJ's credibility assessment, I find that, considering all the evidence as well as the deference this court owes to the ALJ in reviewing such determinations, the ALJ's assessment of Plaintiff's credibility is supported by substantial evidence. First, central to the ALJ's determination was her finding of incongruity between Plaintiff's clinical diagnosis and her alleged pain. *See Eggleston*, 851 F.2d at 1247 (holding an ALJ may question credibility based on inconsistencies between the plaintiff's testimony and other record evidence). As discussed earlier in this section, this finding was supported by substantial evidence. Second, the ALJ pointed to Plaintiff's emergency room records, two of which distinctly noted that Plaintiff was experiencing only a minimal level of pain. (*See* Admin. R. at 281 [complaint of "a little back pain"], 278–79 [complaint of "a little bit" of "intermittent pain"].) Finally, the ALJ pointed out that Plaintiff continued to work for three years after the accident, and when she finally stopped working, there was no change in her medical findings to support her claims of increased pain. (*Id.* at 16.) Although, as Plaintiff notes, she began complaining of increased pain around the three year mark, nowhere does Plaintiff argue, nor does the record support, that any medical findings supported such an increase. (*See* Pl.'s Reply at 3–4.) Indeed, Plaintiff's MRI remained unchanged throughout the medical record.

-26-

(Admin. R. at 225.)  Based on the foregoing, I find the ALJ's credibility determination was supported by substantial evidence.

### b.       Rejection of Treating Physician's Opinion

It is well established that an ALJ is required to give controlling weight to a treating physician's well supported opinion, so long as it is not inconsistent with other substantial evidence of record.  *See* 20 C.F.R. § 404.1527(d)(2) (2006); *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004)*; Frey*, 816 F.2d at 513.  If an ALJ decides not to give a treating physician's opinion controlling weight, the ALJ must consider a series of factors in determining the amount of weight to give the opinion, including the degree to which the opinion is supported by relevant evidence and the opinion's consistency with the record as a whole.  *See* 20 C.F.R.§ 404.1527(d)(2)–(6) (2006); *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995).  Should an ALJ choose to disregard the opinion of a treating physician, the ALJ must set forth "specific, legitimate reasons" for doing so.  *Hamlin*, 365 F.3d at 1215.

In the instant case, the ALJ rejected Dr. Hall's assessment of Plaintiff's limitations, noting that while Dr. Hall was one of Plaintiff's treating physicians:

> his opinion is given little weight because it is not consistent with the minimal medical findings in the file or with the opinions of the independent medical examiners.  Dr. Hall apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant.  Yet . . . there exist good reasons for questioning the reliability of the claimant's subjective complaints.  It is further noted that Dr. Hall's opinion is not based on any specific testing of her functional abilities.

(Admin. R. at 17.)

Plaintiff argues that none of the ALJ's stated reasons for rejecting Dr. Hall's opinion is legitimate. (Pl.'s Br. at 4–8.) First, Plaintiff contends that "there are numerous medical findings consistent" with the limitations imposed by Dr. Hall, including an MRI revealing a herniated disc and a diskogram confirming the T7–8 disc as a pain generator. (*Id.* at 4.) Again, this type of argument reveals Plaintiff's fundamental misunderstanding of her burden. Plaintiff cannot overturn her disability determination by showing that some conclusions that are contrary to those of the ALJ are supported by substantial evidence; instead, she must show that the ALJ's conclusions are *not* supported by substantial evidence. *See Casey*, 987 F.2d at 1233 (noting that, if supported by substantial evidence, the Commissioner's decision must be affirmed, even if the plaintiff's position is *also* supported by substantial evidence). Regardless, as discussed above, I find the ALJ's conclusion that the medical findings did not support the severity and frequency of Plaintiff's pain complaints was supported by substantial evidence. (*See Analysis* § 3a, *infra.*)

Second, Plaintiff argues that the ALJ misapplied the treating physician's rule when she found Dr. Hall's opinion to be inconsistent with Dr. Ridings'. (Pl.'s Br. at 5–6.) According to Plaintiff, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physician's report, not the other way around. (*Id.* [citing *Goatcher*, 52 F.3d at 289–90].) I find the ALJ faithfully performed this task, considering the opinions of other medical sources as *one factor* in assessing the reliability of the opinion of Dr. Hall. *See* 20 C.F.R. § 404.1527(d)(2)–(6) (2006) (mandating multi-factored analysis); *accord Goatcher*, 52 F.3d at 289–90.

Finally, Plaintiff argues the ALJ had no basis for concluding that, in assessing Plaintiff, Dr. Hall relied largely on her subjective complaints. (Pl.'s Br. at 6–7.) Although, as Plaintiff points out, it is true that Dr. Hall did not explicitly state that he based his opinion on such complaints, the vast majority of Dr. Hall's clinical notes are simply recordations of Plaintiff's subjective complaints and make no note of a physical exam or objective observations. (*See* Admin. R. at 263, 267–75. *But see id.* at 264.) Accordingly, I find the ALJ's conclusion that Dr. Hall's assessment was based largely on Plaintiff's subjective complaints was supported by substantial evidence. Plaintiff does not contest that, if supported by substantial evidence, the ALJ's stated reasons for rejecting Dr. Hall's opinion constitute specific and legitimate reasons for doing so. *See Hamlin*, 365 F.3d at 1215. Thus, I find the ALJ's rejection of Dr. Hall's opinion was proper.

### c.    *The ALJ's RFC Assessment*

Finally, Plaintiff argues the ALJ erred in relying on the opinion of a disability examiner in making her RFC assessment. (Pl.'s Br. at 15–16.) Plaintiff's argument is wholly unavailing. It is true that a disability examiner who works for the Social Security Administration and has no medical degree is not a medical opinion on which an ALJ may rely in assessing a plaintiff's RFC. *See* 20 C.F.R. § 404.1513 (2006). Yet, the ALJ's mention of the Disability Examiner makes clear that she did not rely on the examiner's opinion as evidence. Following is the only paragraph in which the ALJ makes mention of the Disability Examiner:

> The Disability Examiner assessed [Plaintiff] as able to perform light work with postural shifting as required. Since the Disability Examiner is not a physician or a psychologist, the document is *entitled to no weight as an expert medical opinion, nor does it constitute evidence from "other non-medical sources"* per 20 C.F.R. §§ 404.1527(f), 404.1513(d)(4), 416.927(f), and 416.913(d)(4). Nevertheless, the

> undersigned notes that the [RFC] assessment prepared by the State agency
> Disability Examiner is well supported by and consistent with the medical record
> (SSR 96–6p).  However, the undersigned is persuaded by the record as a whole
> that the standing/walking requirements of the light exertional level must be
> reduced.

(Admin. R. at 16–17 [emphasis added].)  Plaintiff argues that the ALJ's citation to SSR 96–6p,

which deals with the weight of medical opinions provided by medical sources employed by the

state agency that initially reviews the disability claim, shows that the ALJ considered the Disability

Examiner's opinion to be a medical opinion of the type discussed in the Ruling.  (Pl.'s Br. at

15–16 [citing SSR No. 96–6p, 1996 SSR LEXIS 3 (July 2, 1996)].)  This court refuses to read so

much into a citation when the ALJ explicitly stated that she did *not* consider the Disability

Examiner's opinion to be evidence.  (*See* Admin. R. at 16–17.)  More likely, the ALJ believed the

citation to the Ruling was appropriate given that it requires an ALJ to "explain the weight given"

to the opinions of certain state agency actors.  *See* SSR 96–6p.  Even if the ALJ misunderstood

the Ruling, such an error does not negate the clear and correct statement of the law by the ALJ in

the immediately preceding sentences.  (*See* Admin. R. at 16–17.)  Accordingly, I find the ALJ did

not rely on the Disability Examiner's opinion in making her disability determination.

**4.** *Conclusion*

Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is

AFFIRMED.

Dated this 15th day of February, 2007.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge